LAW and NELSON, plaintiffs in error, *and* JACKSON, ex dem. LANSING, defendant in error.

LAW and BROWN, plaintiffs in error, *and* SAME, defendant in error.

Where a stipulation is entered into by the parties in two actions of ejectment, that but one shall be tried, and the other shall abide the event, and a verdict is found for the plaintiff, and a bill of exceptions taken, on which verdict a judgment is rendered by the supreme court, which is affirmed in the court of errors, *full costs* in each suit will not be allowed for services not in fact performed, or which are wholly unnecessary. The prevailing party

is entitled to charge for a rule for judgment, and making up record in each cause.

The giving of *interest*, by way of damages, in cases of *tort*, is always in the discretion of the court, and, *it seems*, should be allowed, where double costs are not sufficient to cover the actual damage sustained by the delay.

MOTION for re-taxation of costs, and to strike out an allowance of interest. The motion was argued by

*I. Crary*, for the plaintiffs in error, and by

*J. Lansing*, for the defendant in error.

The grounds of the application are stated in the opinion of the chancellor.

THE CHANCELLOR. Ejectments were brought by Lansing against Brown and Nelson, who were tenants of Law, and he joined with them in the defence. The suits, though for different parcels of land, depended upon the same question. At the circuit, the parties stipulated that but one suit should be tried, and the other should abide the event. A verdict was found for the plaintiff in the suit tried, subject to the opinion of the supreme court on a case, with liberty to either party to turn it into a bill of exceptions. The supreme court gave judgment for the plaintiff. In making up the bill of exceptions, through a misapprehension of the practice, the signature of the chief justice was obtained thereto, instead of that of the circuit judge, before whom the cause was tried. The cause was argued here upon the merits ; but some of the members of this court discovering the mistake, the error was considered fatal, and leave was given to the plaintiffs in error to withdraw their assignment of errors on payment of costs, for the purpose of alleging diminution, and having a corrected bill of exceptions brought before the court. Those costs, to the amount of $47 13 in each suit, were paid ; and the bill of exceptions being returned corrected, errors were again assigned, the first cause was argued, and the judgments of the supreme court were affirmed. Towards the close of the last June session of this court, full costs in each suit were taxed by the clerk, and the amount

doubled. Interest on the costs in the court below was also added, by way of damages.

The plaintiffs' counsel applies for a re-taxation, and insists that full costs should not have been taxed in both suits for services which were performed in but one of the suits ; that various items have been taxed in both suits for services not performed in either, or not taxable ; and that a part of the costs paid on the application to withdraw the assignments of errors has been again charged, although no new service of the kind has since been performed. · He also insists that interest ought not to have been taxed on the amount of costs in the supreme court.

Where different causes are depending on the same question, and the whole object of the litigation may be obtained in one suit or proceeding, full costs in each suit ought not to be allowed for services not in fact performed, or which are wholly unnecessary. Such was the decision of the supreme court in *Jackson* v. *Keller*, (18 *Johns. R.* 310,) and in *Boyce* v. *Thompson*, (20 *Johns. R.* 274.) And so have been the latter decisions of the same court in the Appel patent causes, (3 *Cowen*, 385, and 4 *Cowen*, 78,) and in the Massena causes, (4 *Cowen*, 538.) This is a salutary rule, calculated to prevent useless litigation, and to relieve both parties from all unnecessary expense. Fees for services that were paid for at the time the assignment was withdrawn, and which have not again been performed, should not be included in the present bills. Where a judgment in favor of the plaintiff below after verdict is affirmed on error, the plaintiff is entitled, of course, to double costs under the statute ; but the giving of interest by way of damages is always in the discretion of this court. (*Shepherd* v. *Macreth*, 2 *H. Bl. R.* 284.) In *Gelston* v. *Hoyt*, (13 *Johns. R.* 590,) this court unanimously refused to allow interest on the amount of the judgment below in an action of tort. And such is declared to be the practice of the court, though, if the question is not considered as finally settled here, I confess I can see no good reason for refusing interest in such cases, where double costs are not sufficient to cover the actual damage sustained by the delay. In cases arising on contract, interest can always be

ALBANY,
Jan. 12, 1829.

Law
v.
Jackson.

levied on the execution upon the original judgment, whether allowed here or not. It is therefore only in cases of tort where this court can exercise any discretion on the subject of the allowance of interest.

In the cases now before us, the extra. allowance in the costs is an ample compensation for the delay in collecting the costs below ; and the act concerning writs of error, (1 *R. L.* 144,) prescribes a different mode of obtaining compensation for mesne profits and damage done to the land pending the writ of error.

I am therefore of opinion that there should be a re-taxation before one of the justices of the supreme court, with directions to strike out the objectionable items in the first bill, and to allow for no services in the second suit which were not actually and necessarily performed, and to allow no interest on the costs in the court below in either cause.

I also am of opinion that neither party should be allowed the costs of such re-taxation, or of this application.

Mr. Justice SUTHERLAND expressed his concurrence generally in the opinion delivered by the chancellor, and observed, that under a stipulation, as in this case, the party would be entitled to enter a rule for judgment, and make up his record in each case, and might charge for the same, but could not tax the opposite party with witnesses' and jurors' fees, nor with attorney's and counsel fees in attending the trial and arguing the bill of exceptions. As to the question of *interest*, he observed, that in the case of *Gelston* v. *Hoyt* it is said that it is not *in course* to allow interest, and there is no reason why it should be allowed in this case.

This being the *unanimous* opinion of the court, the motion was granted.

ALBANY,
Jan. 12, 1829.

Lieut. Gover-
nor.

Claim of the Lieutenant-Governor, officiating as President of the Senate, to express his opinion and to vote in the decision of every question arising in the court.

January 12.

AFTER the court was opened, the President of the Senate (the Hon. ENOS T. THROOP, Lieutenant-Governor of the state,) arose and observed, that he felt it his duty to state the course which he should pursue whilst presiding in this court, until otherwise directed. On all questions which should come before the court, he conceived that as a member thereof it would be his duty to express an opinion and to vote in the decision thereof, although he should not be called upon to give a *casting vote ;* in which case only he had understood it had been usual for the president to vote, which practice probably originated from a provision in the statute concerning the court of errors, (1 *R. L.* 135, *sec.* 11,) declaring that if the members be equally divided in opinion, the president of the senate shall have a casting vote in the decision, but shall not vote in any other case. This statute was passed in compliance with the requirement of the xxxii. art. of the old constitution, that the court should proceed under such regulations as should be established by the legislature. He doubted the right of the legislature, under the old constitution, to confine the power of one of the members of the court to the giving of a casting vote, as the president of the senate, being a constituent member of the court, necessarily had the same powers as every other member, and could not be restricted in the exercise of them by a legislative act. If, however, the act of the legislature on this subject was not considered as trenching upon the old constitution, inasmuch as that declared that the court should be instituted under such regulations as should be established by the legislature, he conceived it did come in conflict with the v. art. of the new constitution, which directs that the court shall consist of the president of the senate, the senators, the chancellor and the justices of the supreme court,

without reference to any regulations established or to be established by the legislature. He trusted that he would not be considered as influenced by ambitious motives in asserting a power which he conceived incident to his station, and which, except in one or two instances, had not been claimed by his predecessors, but that he was actuated by a sense of obligation, to discharge those duties which he conceived devolved upon him as a member of the court. He had thus presented the question to the consideration of the court, whose province it was to decide the same, in which decision, whatever it might be, he should cheerfully acquiesce.

The CHANCELLOR remarked upon the importance to the public, that every member of the court of the last resort should participate in the examination of, and express an opinion in the causes which came before it. That it must be desirable also to the members of the court, to have the aid of their presiding officer in the determination of the questions brought up for adjudication. As, however, the proposition involved the decision of a constitutional question, respecting which there had been a contrariety of opinion, he suggested the propriety of postponing the decision to a future day.

Mr. Justice SUTHERLAND concurred with the chancellor as to the propriety of postponing the decision. Lieut. Governor Tallmadge, he observed, when presiding in this court, had asserted the same right, and it was then proposed to settle the question by a formal decision, which, however, did not take place. He thought this a proper occasion for settling it, and agreed that a future day should be assigned for acting upon it.

Mr. Senator VIELE made some remarks, tending to show that the president of the senate had only the power of giving a casting vote ; that the question was not affected by the difference of the phraseology of the *new* constitution, which left in force all the provisions relative to the court of errors not abrogated by it. He stated, that on the occasion referred to by Mr. Justice Sutherland, a member from the first

ALBANY,
Jan. 26, 1829.

Lieut. Governor.

senate district offered a resolution, declaring the right of the president of the senate to express an opinion and vote on every question arising in the court; that a day was assigned for the consideration of the question, when the same member who had offered the resolution came into court and read an able opinion in opposition to the resolution offered by himself, and nothing further was done on the subject.

The CHANCELLOR then offered a resolution declaring that the president of the senate has a right equally with the other members to express his opinion and to vote in the decision of every question arising in the court; the consideration of which was postponed for a fortnight, on the suggestion of Mr. Senator OLIVER.

The lieutenant governor acting as president of the senate, has an equal right with the other members of the court for the correction of errors, to express his opinion and to vote in the decision of every question before the court.

January 26th.

THE resolution offered respecting the powers of the president of the senate, officiating in this court, being called up, the CHANCELLOR delivered the following opinion :

The CHANCELLOR. By the proposition before the court, I do not understand that any greater or other powers are claimed for the president of the senate, than for every other member of this court. The first section of the fifth article of the constitution provides that the court for the trial of impeachments and the correction of errors shall consist of the president of the senate, the senators, the chancellor and the justices of the supreme court, or the major part of them. Restrictions are imposed upon the right of the chancellor and justices of the supreme court to vote in certain specified cases ; in all other cases the constitution has left each member of the court in the full possession and enjoyment of equal rights and privileges with every other member. And the question now to be considered is, whether this court, by a rule, or the legislature, by law, can deprive any particular member or members of the right to express an opinion on

any question before the court, or exclude them from a voice in the decision thereof, except in the particular cases specified in the constitution.

A former member of this court, a senator from the first district, came to the conclusion that such power existed from the necessity of the case; that without such power the channels of justice would be blocked up; that if the president was permitted to vote and the court were equally divided, no judgment could be rendered and the record would forever remain here. If that were the case, perhaps a power to provide for such an emergency might be implied; but then it would be necessary to go still further. The president of the senate is not always present, and this court has not the power to make a president of the senate *pro tempore*. In such cases it would be necessary to deprive some other member of his constitutional right of voting, in order to provide for the case of an equal division among the members.

But no such necessity exists. Each of the three great law courts of England has but four judges, and an equal division of the court must therefore be a case of frequent occurrence; yet it has not been found necessary, even there, to deprive the chief baron of the exchequer, or the chief justice of either of the other courts of the power of expressing an opinion and voting in all cases. It is true that on an equal division of the judges of the court of king's bench, they may certify the case into the court of exchequer chamber before the twelve judges of England; but even in that court no provision is made to reserve one of the judges to give a casting vote if the others should be equally divided in opinion.

The effect of an equal division of the members of this court would not be such as has been supposed. From the number of members composing this court, an equal division on any question will not be a case of frequent occurrence; but if such a case should happen, a very simple mode of getting rid of the difficulty would be to direct a re-argument. And as nearly one fourth of the members change every year, it is hardly possible the same result should twice occur in the same cause. A more equitable remedy for the difficulty would be, if a majority of the members of this court were not in favor

of a reversal of the decree or judgment of the court below, to dismiss the writ of error or appeal. In such case the opinion of the chancellor or justices of the supreme court who decided the cause in the court below, and who cannot again vote upon the same question here, should be permitted to turn the scale. But by excluding the president from any other than a casting vote, the reverse of that will be the case; and the decision of the court below will be overturned, without the consent of a majority of the members of this court who are constitutionally competent to vote on the question, contrary to the settled maxim of law, that the judgment of the inferior court is presumed to be correct until the contrary is shown. Thus, on a writ of error to the supreme court, if twenty members were present, constitutionally competent to vote on the question of affirmance or reversal, if ten members of this court, including the president, thought the judgment of the supreme court correct, it must still be reversed if the other ten members thought differently ; and no weight whatever would be given to the opinions of the justices of the supreme court who had originally decided the cause. I am satisfied such a result never could have been contemplated by the framers of the constitution, especially when it is seen that they have expressly prohibited the lieutenant governor from voting in the senate, except in the case of an equal division ; but no such prohibition is inserted in relation to his powers as a member of this court. But even that prohibition does not extend to a president *pro tempore* of the senate, when the lieutenant governor is administering the government. That provision was undoubtedly adopted on the principle that every part of the state was represented in the senate by the senators, and that it would be improper for the lieutenant governor, who represents the people at large, to vote, unless the senators who represented the people in their several districts were equally divided. On the contrary, the president *pro tem.* of the senate and the speaker of the house of assembly are permitted to vote in all cases when their votes can possibly affect the question under consideration ; otherwise their particular constituents would be deprived of a voice in the decision of the question. In this court there would be

ALBANY,
Jan. 26, 1829.

Lieut. Governor.

ALBANY,
Jan. 26, 1829.

Lieut. Gover-
nor.

more propriety, on the principle of representation, of exclu-
ding the chancellor and justices of the supreme court from
voting, unless the senators were equally divided, than there
is in excluding the president of the senate when that office is
not filled by the lieutenant governor. But there is no such
thing as representation in this court. The wishes of constit-
uents are not to influence the votes of members here. Each
member of this court acts upon his own responsibility. He
is bound to administer the laws of the land as he finds them,
without regard to the wishes of any person whatsoever; and
where the constitution has not otherwise provided, all have
the same and equal rights.

The framers of our constitution were well acquainted with
the principle of the common law, that where a motion is
made in a court of justice, and the judges of that court are
equally divided on the question, the mover takes nothing by
his motion; (*Foot* v. *Tracy*, 1 *Johns. Rep.* 54; *Iveson* v.
*Moore*, 1 *Salk.* 17; *Chapman* v. *Lamphire*, 3 *Mod. Rep.* 156;)
and it is not to be supposed they meant to authorize this court
or the legislature to reverse that rule.

I am not aware that this question was ever decided in this
court under the provisions of the former constitution. It is
therefore not necessary to inquire whether there is any ma-
terial difference between that and the present constitution.
Under the former, the legislature were directed to organize
the court under such regulations as they should establish.
But even there the constitution directed who should be mem-
bers of the court, and imposed the same restrictions upon the
right of the chancellor and judges to vote which are to be
found in the new constitution. I have no doubt of the pow-
er of the legislature, even under the present constitution, to
regulate the proceedings in this court. But I deny that it
was the intention of the framers of either constitution, to au-
thorize the reversal of a judgment or decree, or the granting
of any motion without the concurrence of a majority of the
members present who are constitutionally competent to vote
on the question. I also insist that it is not in the power of
the legislature or of this court, to deprive any member of the
power of voting, except in the particular cases provided for

in the constitution, or in cases which are always implied ex-
ceptions, founded upon the universal principle of justice, that
no one shall be a judge in his own cause, or in cases where
from his connection with the parties there is a reasonable
presumption that his feelings and wishes will influence his
judgment.

The power of this court to exclude any member from vot-
ing, except in the cases particularly provided for in the con-
stitution, was denied by Chief Justice Kent and Judge
Thompson, in the case of *Yates*, (6 *John. Rep.* 408, 416.)
I also understand that the judges of the supreme court, un-
der the new constitution, have supported that opinion of their
predecessors; and that this court has finally pronounced in
favor of that opinion.

The question now before the court has been virtually de-
cided by the legislature in the recent revision of the laws.
The provision contained in the acts of 1784 and 1801, ex-
cluding the president from a vote, was inserted by the revi-
sors, with a note appended thereto that it was doubted whe-
ther it was not repugnant to the spirit of the constitution.
And the legislature, after a careful examination of the ques-
tion, ordered the objectionable clause to be stricken out.
Although the revised laws have not yet gone into effect, this
may nevertheless be considered as a legislative construction
of the new constitution.

It may also be proper to add, that the right now claimed
by the president of the senate, was claimed, and I believe
actually exercised, by the first lieutenant governor elected
under the new constitution, and by his successor in office;
but the question remains still undecided. There is a mani-
fest impropriety in leaving such a question to a time when
its decision, the one way or the other, would directly
affect the particular cause then under consideration. This
question has been agitated at such times, but a feeling
of delicacy has induced the presiding officer to waive his
right to vote in the particular cause then before the court;
and in that way the question has been permitted to rest.
There being no case now before the court which can possi-
bly be supposed to influence the vote of any member on

ALBANY,
Jan. 26, 1829.

Lieut. Governor.

this question, there never can be a more favorable opportunity to give it a deliberate investigation. I am therefore gratified that the president has brought it thus early before the court ; and I hope it may at this time be finally decided and put at rest.

This is a question of constitutional law, in relation to which it is the duty of every member of this court to form an opinion for himself. And it is the more important that this court should come to a correct conclusion, as no other tribunal is competent to review their decision on such a question. Having given my reasons for believing that the president of the senate has an equal right with the other members to express his opinion, and to vote in the decision of every question before this court, it cannot be necessary to add, I shall be satisfied with any decision which the court may make on the question now before them, although that decision should be in opposition to the opinion which I have thus expressed.

Mr. Justice SUTHERLAND expressed his concurrence substantially in the conclusions at which the chancellor had arrived, being of opinion that the constitution intended that the president of the senate, acting in the court for the correction of errors, should possess as full powers as any other member of the court. He is a constituent member of the court, and whether the office is filled by the lieutenant governor of the state, or by a senator, (when the lieutenant governor administers the government,) does not alter the conclusion. In either case he has a right to express his opinion, and to vote in the decision of any question before the court.

The CHIEF JUSTICE was not present at the decision of this question.

The question being put on the resolution offered, it was decided in the *affirmative :* Ayes 23, noes 5.